Case 3:23-cv-00167   Document 141   Filed on 12/17/25 in TXSD   Page 1 of 11

United States District Court
Southern District of Texas
**ENTERED**
December 17, 2025
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | §  | |
|---|---|---|
| IN RE M/V AET EXCELLENCE AND | § | |
| M/V AET INNOVATOR | § | CIVIL ACTION NO. 3:23-cv-00167 |
| | § | |
| | § | |

## OPINION AND ORDER

Pending before me in this consolidated triple limitation proceeding are two motions to exclude expert opinions filed by Limitation Petitioner AET.[1] AET seeks to exclude the testimony and opinions of two of Plaintiffs' experts: Dr. Christopher R. Sellars, D.O. (Dkt. 96) and Harold A. Asher, CPA (Dkt. 97). Having reviewed the briefing and the applicable law, I grant both motions.[2]

## BACKGROUND

The court is familiar with the facts of this case. *See* Dkt. 129 at 2–5. Claimants Jose Uresti and Gerald Arukwe allege that they sustained injuries while employed by AET. To support their claims for damages, Claimants retained Dr. Sellars and Asher to prepare expert reports. Dr. Sellars, a board-certified physiatrist, prepared life care reports for Claimants. Asher, a forensic economist, prepared loss of economic capacity reports for Claimants. AET seeks to exclude the testimony and opinions of both experts under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

## LEGAL STANDARD

Rule 702 governs the admissibility of expert testimony. As amended in 2023, the rule provides that an expert witness may testify if:

---

[1] "AET" includes AET Lightering Services LLC; AET Offshore Services, Inc.; and the M/V *AET Innovator*.

[2] "District courts in the Fifth Circuit have universally treated motions to strike expert testimony as non-dispositive matters within the statutory jurisdiction of magistrate judges." *Lloreda v. Dolgencorp of Tex., Inc.*, No. 3:21-cv-00171, 2022 WL 203258, at *1 n.1 (S.D. Tex. Jan. 24, 2022) (collecting cases).

> the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

As a preliminary matter, a district court must determine whether the proffered witness qualifies as an expert "by virtue of his 'knowledge, skill, experience, training, or education.'" *United States v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009) (quoting Fed. R. Evid. 702). If the expert is qualified, the "overarching concern" becomes "whether the testimony is relevant and reliable." *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 293 (5th Cir. 2019). The party offering the expert opinion must establish admissibility by a preponderance of the evidence. *See Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 400 (5th Cir. 2016); Fed. R. Evid. 702.

To be reliable, expert testimony must "be grounded in the methods and procedures of science and be more than unsupported speculation or subjective belief." *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (cleaned up). To further establish reliability, an expert must furnish "some objective, independent validation of his methodology. The expert's assurances that he has utilized generally accepted principles is insufficient." *Brown v. Ill. Cent. R.R. Co.*, 705 F.3d 531, 536 (5th Cir. 2013) (cleaned up). To be relevant, "the expert's reasoning or methodology [must] be properly applied to the facts in issue." *Arkema*, 685 F.3d at 459 (quotation omitted). Expert testimony must also "assist the trier of fact to understand or determine a fact in issue." *Weiser–Brown Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 801 F.3d 512, 529 (5th Cir. 2015) (quotation omitted).

A district court's role under Rule 702 "is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role—the court's role is limited to ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue so that it is appropriate for the jury's consideration." *Puga*, 922 F.3d at 294. Occasionally, "the source upon which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that opinion. Expert opinion testimony falls into this category when that testimony would not actually assist the jury in arriving at an intelligent and sound verdict." *Fair v. Allen*, 669 F.3d 601, 607 (5th Cir. 2012) (quotation omitted). "Cross-examination at trial, however, is the proper forum for discrediting testimony, and credibility determinations are, of course, the province of the jury." *Dearmond v. Wal–Mart La. LLC*, 335 F. App'x 442, 444 (5th Cir. 2009). While I have broad discretion in determining whether to admit or exclude expert testimony, I must exclude testimony where there is "simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## ANALYSIS

**A.   DR. SELLARS'S LIFE CARE REPORTS**

Dr. Sellars has prepared life care reports for each Claimant. These reports purport to estimate the expenses attributable to Claimants' future medical requirements. *See* Dkt. 100-8 at 5; Dkt. 100-9 at 5. These medical expenses are divided into seven categories: (1) Physician Services; (2) Routine Diagnostics; (3) Medications; (4) Laboratory Studies; (5) Rehabilitation Services; (6) Equipment & Supplies; and (7) Environmental Modifications & Essential Services. *See id.* Dr. Sellars estimates that Uresti's future medical requirements will total $429,423.59 over 36 years. *See* Dkt. 100-8 at 5. Dr. Sellars estimates that Arukwe's future medical requirements will total $258,510.18 over 22 years. *See* Dkt. 100-9 at 5.

AET moves to exclude both life care reports, arguing that "Dr. Sellars' methodology [in preparing the reports] is not reliable and his methodology has not

been reliably applied to the facts of the case. Specifically, none of Dr. Sellars' opinions are based on evidence that he relied on in forming his opinions." Dkt. 96 at 14. As such, AET contends that "Dr. Sellars' opinions thus fail to bridge the analytical gap between this data and his conclusions about Plaintiffs' future medical requirements." *Id.* at 17 (cleaned up). Further, AET argues that "[t]o the extent any of Dr. Sellars' opinions regarding future medical care include services that Plaintiffs would have needed before the incidents, his opinions are irrelevant because they fail to help the trier of fact determine the measure of damages attributed to the incidents at issue in this case." *Id.* at 18.

In response, Claimants assert that "Dr. Sellars is ***uniquely qualified*** to render his opinions as a physician life-care planner, even over other specialties in medicine." Dkt. 106 at 14. Claimants also argue that "[t]hrough his scientifically accepted methodology, Dr. Sellars rendered opinions at issue upon reasonable degree of medical probability." *Id.* at 16 (quotations omitted). Finally, Claimants argue that "AET has provided this Court with no expert evidence, scientific authority, and certainly no on-point jurisprudence that would even suggest that Dr. Sellars' opinions are somehow unqualified, unsupported, or unreliable." *Id.* at 26.

### 1.   *Dr. Sellars Fails to Explain the Basis for His Opinion*

To be admissible at trial, an "expert's opinion must offer more than a bottom line." *Wright Asphalt Prods. Co., LLC v. Pelican Refining Co.*, No. H-09-1145, 2012 WL 1936416, at *11 (S.D. Tex. May 29, 2012) (quotation omitted). "The expert must explain the methodologies and principles supporting the opinion." *Id.* (quotation omitted). "[U]nexplained conclusions . . . [are] an inadequate basis for th[e] court to assess reliability." *Id.*

In this case, Dr. Sellars fails to explain how he reached his opinions as to Claimants' future medical needs. As AET points out: "Dr. Sellars simply offers recommendations about [Claimants]' future needs without explaining how he determined which services were necessary, the data he relied on to reach his

4

conclusions, or how he determined the duration of each recommended treatment." Dkt. 108 at 8. Because Dr. Sellars does not adequately explain how he arrived at his opinions, he has failed to provide a reliable foundation for his conclusions. His testimony must be excluded.

This is not the first time a judge in this district has prohibited Dr. Sellars from testifying at trial about a life care plan he prepared. *See De Alfaro v. Panther II Transp., Inc.*, No. CV H-22-2619, 2024 WL 2725047 (S.D. Tex. May 28, 2024). In *De Alfaro*, Judge Lee Rosenthal excluded a life care plan from Dr. Sellars because it "fail[ed] to adequately explain the basis for his recommendations for life-long therapy, testing, and medication." *Id.* There, Dr. Sellars recommended extensive future care for the plaintiff, including:

> physical medicine & rehabilitation/pain management four times yearly for the first ten years, then three times yearly for the next thirty-four years, psychiatrist, MRI brain scans five times yearly for thirty-nine years, X-Rays and MRIs of the cervical spine, shoulder, lumbar spine, knee, foot/ankle for forty-four years, daily dose of Tylenol, NSAID, an over the counter topical analgesic, and a prescription analgesic for forty-four years, yearly lab tests, physical therapy evaluations and physical therapy sessions for forty-four years, as well as various equipment and supplies.
>
> . . .
>
> Additionally, Dr. Sellars opine[d] that [plaintiff] will need to take an antidepressant for the rest of her life, costing $336,331.68.

*Id.* (quotation omitted).

In *De Alfaro*, Dr. Sellars based his recommendation for future medical requirements on a review of the plaintiff's medical records and a video interview with the plaintiff. *See id.* But because Dr. Sellars did not "bridge the analytical gap between this data and his conclusions about [plaintiff]'s future medical requirements," Judge Rosenthal excluded his report in full. *Id.*

Here, Dr. Sellars has, likewise, failed to reliably apply his methodologies to the facts of the case. Although Dr. Sellars did review Claimants' medical records and interviewed Claimants virtually, his life care plans are devoid of:

5

(1) explanation or analysis of how he determined that the future medical treatments recommended for either Claimant are necessary based on his review of their respective records and interviews; or (2) explanation or analysis of how he determined that specific medication, testing, or services would be required for either Claimant for the rest of their lives.

By way of example, Dr. Sellars opines that Uresti will need to take Cymbalta, an antidepressant, for 36 years at a total cost of $104,392.80. *See* Dkt. 100-8 at 91. Dr. Sellars does not, however, "explain how he reached the conclusion that the specific . . . medication set out in the plan [is] required, much less that [it] will be required for the remainder of [Uresti]'s life." *De Alfaro*, 2024 WL 2725047, at *6. Dr. Sellars merely concludes, without explanation, that Cymbalta is required. This is insufficient to satisfy *Daubert*. *See Watkins v. New Palace Casino, LLC*, No. 1:13cv224, 2014 WL 10100196, at *6 (S.D. Miss. Nov. 6, 2014) (excluding expert opinions in life care plans because they were based on unsupported speculation and subjective belief). Although none of Uresti's treating physicians ever mentioned any cognitive or emotional issues, Dr. Sellars recommends that Uresti take antidepressants, undergo brain MRI scans, and participate in cognitive rehabilitation therapy. Dr. Sellars's recommendations "are unsupported by the medical records generated by [Uresti]'s treating physicians, and [Dr. Sellars] fails to explain the basis for his additional treatment recommendations." *Queen v. W.I.C., Inc.*, No. 14-cv-519, 2017 WL 3872180, at *4 (S.D. Ill. Sept. 5, 2017) (excluding a life care planner's testimony because the recommendations were not supported by the plaintiff's medical records or recommended by treating doctors).[3]

---

[3] There is a separate and independent reason that Dr. Sellars cannot opine on Uresti's future medical needs for antidepressants, brain MRI scans, and cognitive rehabilitation therapy. "Dr. Sellars has not demonstrated that he is qualified to opine that [Uresti] must take an antidepressant for the remainder of [his] life, a recommendation that has not been made by [Uresti]'s treating physicians. Dr. Sellars is a physical medicine and rehabilitation specialist, not a psychiatrist." *De Alfaro*, 2024 WL 2725047, at *6; *see also Robinson v. Ethicon, Inc.*, 580 F. Supp. 3d 452, 460 (S.D. Tex. 2022) (holding that an

This same deficiency applies to the "specific therapies [and] testing" that Dr. Sellars recommends for both Claimants. *De Alfaro*, 2024 WL 2725047, at *6. Dr. Sellars recommends 36 years of spinal MRIs and X-Rays for Uresti, and 22 years of spinal MRIs and X-Rays for Arukwe, but provides no explanation of how or why he determined that these specific tests are necessary for that duration of time. *See* Dkt. 100-8 at 80; Dkt. 100-9 at 73.

In his expert reports, Dr. Sellars insists that Claimants' future medical needs will include "Essential Services." For Uresti, Dr. Sellars estimates "Essential Services" costing $43,200.00 over 36 years. *See* Dkt. 100-8 at 130. For Arukwe, Dr. Sellars estimates "Essential Services" costing $26,400.00 over 22 years. *See* Dkt. 100-9 at 109. From my review of Dr. Sellars's expert reports, I am unable to decipher what "Essential Services" include. The only description in the life care plans for "Essential Services" are as an "allowance." *See* Dkt. 100-8 at 59; Dkt. 100-9 at 58. Like a crafty magician, Dr. Sellars apparently pulls these numbers out of thin air. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146. Yet *ipse dixit* is all Dr. Sellars offers in his life care plans for Claimants. The analytical gaps in Dr. Sellars's life care plans are abundant, and prevent me from finding that he reliably applied his methodologies to the facts of this case.

I am fully aware that Dr. Sellars's life care plans are quite lengthy—110 pages for Arukwe and 162 pages for Uresti. But the length of a report does not automatically mean that an expert has provided a reliable foundation for his conclusions. I also recognize that Dr. Sellars states that his future medical recommendations are made with the intent to:

> (1) Diminish or eliminate [Claimant]'s physical and psychological pain and suffering.

---

expert may not testify that a plaintiff needs treatments that require a medical doctor's prescription); *Watkins*, 2014 WL 10100196, at *8 (same).

7

(2) Reach and maintain the highest level of function given [Claimant]'s unique circumstances.

(3) Prevent complications to which [Claimant]'s unique physical and mental conditions predispose him.

(4) Afford [Claimant] the best possible quality of life in light of his condition.

Dkt. 100-8 at 40; Dkt. 100-9 at 39. These vague statements by Dr. Sellars concerning his intentions in crafting the life care plans do not explain how he reached his ultimate conclusions for Claimants' future medical requirements. Dr. Sellars's opinions regarding physical treatments, testing, therapies, and services have similar analytical gaps.

Claimants argue that AET should have deposed Dr. Sellars to elicit the basis of his opinions. *See* Dkt. 106 at 25 ("AET did ***not*** care to depose Dr. Sellars and to ask him for any explanations behind his opinions that they failed to grasp."). This argument goes nowhere. The burden rests on the "proponent of the expert testimony" to establish reliability by a preponderance of the evidence. *Sims*, 839 F.3d at 400. Dr. Sellars's has failed to "bridge the analytical gap between this data and his conclusions." *De Alfaro*, 2024 WL 2725047, at *6. For that reason, Dr. Sellars's opinions must be excluded.

### 2. *Dr. Sellars Fails to Establish That the Medically Necessary Future Care Was Caused by the Incidents at Issue in This Lawsuit*

AET also argues that "[Dr. Sellar's] opinions are irrelevant because they fail to help the trier of fact determine the measure of damages attributed to the incidents at issue in this case." Dkt. 96 at 18. Claimants raise no response to this argument.

Dr. Sellars states that he "consider[s] all future medical requirements in this Life Care Plan's Cost Analysis medically necessary, and I consider them specifically attributable to the medical conditions which resulted from [Claimant's] occupational accident." Dkt. 100-8 at 9; Dkt. 100-9 at 9. This is nothing more than a "bottom line or *ipse dixit* conclusion." *Queen*, 2017 WL 3872180, at *3 (quotation

8

omitted). I am hard pressed to understand how Dr. Sellars could opine on causation when he did not review any of Claimants' medical records prior to the December 7, 2022 incident involving both Claimants. Because Dr. Sellars has not demonstrated that "he used a reliable methodology, and reliably applied that methodology to the facts, to determine causation," his "conclusory explanation of the causal link between the accident[s] and [Claimants'] injuries is inadmissible." *De Alfaro*, 2024 WL 2725047, at *7.

**B.   ASHER'S LOSS OF EARNING CAPACITY OPINIONS**

I now turn to address the expert opinions offered by Asher. Asher has prepared expert reports for both Claimants, detailing opinions on Claimants' loss of earning capacity. Based on the assumption that Claimants are totally and permanently disabled and that they will not be returning to the workforce, Asher calculates Uresti's after-tax loss of economic capacity at $3,309,004, *see* Dkt. 100-11 at 4, and Arukwe's after-tax loss of economic capacity at $1,311,844. *See* Dkt. 100-12 at 4. AET seeks to exclude Asher's opinions regarding loss of economic capacity, on the ground that his "failure to independently validate or assess the assumption that Plaintiffs are permanently disabled is by itself reason for exclusion." Dkt. 97 at 14. Recycling many of the same arguments made in the motion to exclude Dr. Sellars's testimony and opinions, Claimants respond, in relevant part, that "experts are ***allowed*** to (and, indeed, must) make assumptions in coming to their conclusions." Dkt. 105 at 12.

"Rule 702 and Daubert require an expert witness independently to validate or assess the basis for his or her assumption." *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 26 F.4th 256, 268 (5th Cir. 2022). While it is true that expert witnesses "are permitted to rely on assumptions when reaching their opinions[,] . . . those assumptions must have some factual basis in the record and an underlying rationale." *Jacked Up, LLC v. Sara Lee Corp.*, 291 F. Supp. 3d 795, 806–07 (N.D. Tex. 2018); *see also Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 389

9

(5th Cir. 2009) (affirming exclusion of expert opinion that relied on erroneous information).

Asher's loss of economic capacity reports presume that each respective Claimant is permanently and totally disabled. It is undisputed that Asher "did not rely on any objective evidence that [Claimants are] permanently and totally disabled." *Harper v. Geico Indem. Co.*, No. CV 22-4347, 2024 WL 1141167, at * 8 (E.D. La. Mar. 15, 2024). Rather, Asher based his permanent and total disability assumption solely on Claimants' counsel's request "to assume that [Claimants are] totally and permanently disabled and will not return to the workforce." Dkt. 100-11 at 2; Dkt. 100-12 at 3. Courts in this circuit have found such unsupported assumptions to be a basis for excluding expert's opinions as unreliable. *See, e.g.*, *Exume v. United Cargo Logistics, LLC*, No. 4:24-CV-205, 2025 WL 1688329, at *6 (E.D. Tex. June 16, 2025) ("The largest gap in Cavazos's analysis is his glaring assumption that Plaintiff's injury, whatever it may be, will remain constant as a permanent disability for the remainder of her life."); *Harper*, 2024 WL 1141167, at *9 ("Comeaux's assumption that Richard Harper is permanently disabled must be excluded because it is not supported by a preponderance of the evidence."). Tellingly, Claimants cannot point to any evidence in the record to support the notion that Claimants are permanently disabled and unable to work. Not a single expert witness or treating physician has opined that Claimants are permanently disabled and unable to work.

Because Asher's opinions on loss of earning capacity rely entirely on the unsupported assumption that Claimants are permanently and totally disabled, Asher's testimony and opinions must be excluded in their entirety. *See Koele v. Radue*, 260 N.W.2d 766, 769 (Wis. 1978) (trial court properly rejected expert testimony concerning loss of economic capacity when expert's "assumption of permanent and total loss of earning capacity" was "mere . . . conjecture"). Claimants argue that Asher's reports are merely a "***starting point***," which the jury can adjust and use to calculate the Claimants' respective loss in light of the

10

facts. Dkt. 105 at 15. The reports, however, give no insight on how a jury could accurately reduce or adjust the lost economic capacity calculation. This will complicate the jury's job, not assist it. Accordingly, Asher's "lack of reliable support may render [his opinion] more prejudicial than probative, making it inadmissible under Fed. R. Evid. 403." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). Asher's loss of economic capacity opinions are excluded.

## CONCLUSION

In sum, I **GRANT** AET's motions to exclude Dr. Sellars's and Asher's testimony and opinions. *See* Dkts. 96, 97.

SIGNED this 17th day of December 2025.

_____
ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE

11